**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MICHAEL WADE, a/k/a Mark A.
Mlawer, by and through his next
friend; TIMOTHY WADE, a/k/a Paul
Marchand, by and through his next
friend; JOHN MCCLELLAND, a/k/a
Christine E. Boswell, by and
through his next friend,
Plaintiffs-Appellants,

and

MARY HUNT, a/k/a Christine E.
Boswell, by and through her next
friend; MATROY FOSTER, a/k/a
Barbara Nelson, by and through her
next friend; SARAH HOWVITZ, by and
through her guardian, All of the

above on Behalf of Themselves and
All Other Similarly Situated,
Plaintiffs,

v.

DIANE COUGHLIN, Director,
Developmental Disabilities
Administration; ALLAN RADINSKY,
Administrator, Great Oaks Center;
GEORGES C. BENJAMIN, Secretary,
Department of Health and Mental
Hygiene; THE STATE OF MARYLAND;
GREAT OAKS ASSOCIATION,
INCORPORATED, a Maryland nonstock
corporation,
Defendants-Appellees

No. 99-1560

VIRGINIA SOCIETY FOR HUMAN LIFE;
AMERICAN CIVIL LIBERTIES UNION OF
NORTH CAROLINA LEGAL FOUNDATION,
INCORPORATED; AMERICAN CIVIL

LIBERTIES UNION OF WEST VIRGINIA;
AMERICAN CIVIL LIBERTIES UNION OF
VIRGINIA,
Amici Curiae.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(CA-91-2564-CCB)

Argued: March 1, 2000

Decided: May 24, 2000

Before MICHAEL, Circuit Judge, and
G. Ross ANDERSON, Jr., United States District Judge
for the District of South Carolina, sitting by designation,
and James H. MICHAEL, Jr., Senior United States District Judge
for the Western District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Steven Ney, MARYLAND DISABILITY LAW CEN-
TER, Largo, Maryland, for Appellants. Kathleen A. Morse, Assistant
Attorney General, Baltimore, Maryland, for Appellees. **ON BRIEF:**
Susan Goering, AMERICAN CIVIL LIBERTIES UNION OF
MARYLAND, Baltimore, Maryland; Ira Burnim, BAZELON CEN-

TER FOR MENTAL HEALTH LAW, Washington, D.C.; Arthur B. Spitzer, AMERICAN CIVIL LIBERTIES UNION OF THE NATIONAL CAPITAL AREA, Washington, D.C., for Appellants. J. Joseph Curran, Jr., Attorney General of Maryland, Maureen A. Dove, Assistant Attorney General, Baltimore, Maryland, for Appellees. Roger E. Warin, Tracy L. Hilmer, STEPTOE & JOHNSON, L.L.P., Washington, D.C., for Amici Curiae.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

The State of Maryland voluntarily provided the relief sought by § 1983 plaintiffs who were residents of a large State facility for the developmentally disabled. There was no settlement agreement, however, and the lawsuit was dismissed by stipulation pursuant to Fed. R. Civ. P. 41(a)(1). Thereafter, the plaintiffs invoked the "catalyst theory" of "prevailing party" status to seek attorneys' fees under 42 U.S.C. § 1988. The district court denied the fee petitions on the ground that our court had rejected the catalyst theory in S-1 and S-2 v. State Board of Education, 21 F.3d 49 (4th Cir. 1994) (en banc). Because we agree that S-1 and S-2 governs, we affirm.

I.

The Great Oaks Center (the Center) in Silver Spring, Maryland, was a residential institution for the developmentally disabled that was operated by the State of Maryland through its Developmental Disabilities Administration (DDA), a division of the State Department of Health and Mental Hygiene (DHMH). The Center opened in 1970 and its number of residents grew to a peak of about 500 in 1978. Many of the Center's residents, including several of the plaintiffs in this case, were diagnosed with "profound mental retardation." The Center

3

proved to be exceedingly difficult to run, and allegations of problems led the U.S. Department of Justice (DOJ) in 1986 to commence an investigation into conditions there, pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 et seq.

In January 1991 the DOJ issued written findings and advised then-Governor Schaefer of Maryland that "the State subjects its residents of Great Oaks to conditions that violate their constitutional rights, including conditions that generally threaten the[ir] health and safety." Although the DOJ concluded that the "administration and staff at Great Oaks appear[ed] committed to providing residents with appropriate care in a safe environment," the DOJ discovered five conditions that posed significant dangers to residents. First, according to the DOJ, the Center failed to provide sufficient training for residents to help them avoid undue risks to their personal safety. This lack of training led the Center's staff to make unreasonable use of physical and chemical restraints. Second, there was a general failure to provide residents adequate protection from physical injuries. Third, the Center's staff was not appropriately trained. As a result, residents were not properly supervised, which "contribute[d] to [the] alarmingly high frequency of resident injuries." Fourth, physical therapy services for residents were woefully inadequate. This deficiency, the DOJ believed, had caused a number of residents to lose the "ability to feed themselves, walk, or propel their wheelchairs." Fifth, recordkeeping at the Center was deficient. For example, the Center did not keep behavioral records for residents, and data about each resident's progress (or lack of it) were not collected in a consistent manner. Because of poor recordkeeping, the staff was unable "to render [informed] professional judgments regarding care, treatment, and training of residents." The State contends that it took appropriate remedial measures in response to the DOJ report.

Nevertheless, in September 1991, about eight months after the DOJ issued it findings, six residents of the Center (by their next friends) brought this § 1983 class action against the State of Maryland and various officials (collectively, the "State"), alleging deficiencies in the care provided at the Center. By the agreement of counsel, a representative sample of sixteen residents (ten percent of the population) was selected for purposes of pretrial discovery. The Center produced the

4

complete institutional file for each of these residents, and discovery began.

It appears that the Center continued to run into difficulty after the DOJ report was issued and this lawsuit was filed. For example, in the summer of 1994 the Center lost its status as a Medicaid provider because it did not meet certification requirements. By the end of 1994 the plaintiffs' lawyers believed that a more comprehensive complaint was warranted, and an amended complaint was filed on December 22, 1994. The theme of the amended complaint was that "Great Oaks Center is a dangerous place to live." The plaintiffs alleged (1) that they had been "subjected to injury, abuse, neglect, and unnecessary physical restraints" and (2) that they had been denied "necessary medical care, as well as habilitative services needed to prevent their deterioration," in violation of the Due Process and Equal Protection Clauses, the Social Security Act, the Rehabilitation Act of 1973, and the Americans with Disabilities Act. Among other things, the plaintiffs took aim at the Center's policy of allowing parents (or close relatives) to override professional staff recommendations to transfer residents into community-based care facilities. Injunctive relief was requested. The plaintiffs asked that the State be (1) enjoined from admitting any new residents to the Center and (2) ordered to transfer current residents to community living arrangements in accordance with the recommendations of their treating professionals.

The State filed its answer to the amended complaint on January 11, 1995. In addition to denying the charging allegations of the amended complaint, the State defended the Center's policies and alleged that each resident was receiving individualized care appropriately tailored to his or her circumstances. Among other things, the State alleged that (1) successful community placement efforts had reduced the Center's population to 160 residents, (2) the staff-to-resident ratio had improved, (3) training programs for both staff and residents had been instituted, (4) professional staff assessed each resident's needs on an ongoing basis, (5) restraints were used infrequently and only in behavioral emergencies, (6) a new incident tracking system had helped to reduce the number of resident injuries, and (7) the physical appearance of the Center had been improved.

On February 21, 1995, the district court consolidated this case with three other (similar) cases and set a date for trial. In the meantime, the

5

State decided to close the Center. Dr. Georges Benjamin, Deputy to the Secretary of the DHMH, and Diane Ebberts, Acting Director of the DDA, told the Center's staff at a meeting in August 1995 that the Center was being closed because of the pending lawsuit, high employee turnover, high costs, and building repair needs. DHMH Secretary Martin Wasserman mentioned the lawsuit when he reported on plans to close the Center to committees of the Maryland General Assembly in June 1995:

> The closure of Great Oaks Center is based on costs which are escalating beyond any other Developmental Disabilities Administration (DDA) facility, and upon employee recruitment and retention problems which have made it problematic for Great Oaks Center to maintain its license and certification for federal Medicaid funding, to meet U.S. Department of Justice requirements, and to prepare for a successful trial in the case of Hunt v. Meszaros [the caption of this case in district court].

After the State decided to close the Center, the district court, by order entered October 20, 1995, postponed the trial. Shortly thereafter, beginning in November 1995, DHMH Secretary Wasserman wrote individual letters to the residents of the Center and their parents (or guardians). In each letter the Secretary reported his finding that the resident "no longer meets [state law] requirements for admission to a State Residential Center because there is a less restrictive kind of service that is available which is consistent with [his or her] welfare and safety." The resident was accordingly designated for transfer to "community placement." The Secretary further acknowledged that "as a result of discussions with parties to a lawsuit," the State had adopted a new procedure for resolving any parental objection to the placement of a resident in a community-based facility. Parents would no longer have the option to veto a professional recommendation of community placement. Instead, any parental objection would be referred (upon request of the parent) to an administrative law judge for hearing and decision.

In January 1996 the State moved to dismiss the amended complaint on the ground that the State was "doing precisely" what the plaintiffs had requested in their prayer for relief: in the State's words, "the dein-

6

stitionalization of the residents of the Center and placement of indi-vidual residents in community centers." In due course, all but two of the Center's residents were moved to community-based housing, and the Center was closed.* On September 8, 1998, the parties stipulated to a dismissal of the lawsuit, agreeing that there was "no further need for litigation." The stipulation, however, stated that "the dismissal will have no bearing on the parties' positions for the purposes of attor-neys' fees and should [not] be construed . . . as a settlement for the purpose of attorneys' fees."

The several lawyers for the plaintiffs pressed petitions for attor-neys' fees and expenses, notwithstanding the dismissal. Altogether, the lawyers sought fees and expenses in the amount of $1,081,588.26. They were entitled to fees, they said, because their clients were pre-vailing parties for purposes of 42 U.S.C. § 1988, The Civil Rights Attorney's Fees Awards Act of 1976. The lawyers argued to the dis-trict court that their clients had prevailed because their lawsuit caused the State to change its conduct and provide the relief requested (the Center's residents were placed in community-based homes and the Center was closed), even though there was no enforceable judgment or settlement document. Fees were thus sought under what is known as the "catalyst theory."

The district court acknowledged that the plaintiffs had "advanced a strong argument for prevailing party status" under the catalyst the-ory, "in light of the closing of the Center and the placement of its resi-dents in the community." The court added that the plaintiffs had "presented a substantial showing" that their efforts had contributed in a significant way to this result. However, the court stopped short of actually finding that the plaintiffs' lawsuit had served as a catalyst for the change in the State's position. Rather, the district court denied the petitions for fees on the ground that the catalyst theory for attorneys' fee recovery is not available to a § 1983 plaintiff in this circuit. See S-1 and S-2, 21 F.3d at 51 (rejecting the catalyst theory and holding

_____

*The State contends that the Center was closed because of (1) the State's commitment to community placement, (2) high costs and prob-lems with employee recruitment and turnover, (3) capital improvement needs, and (4) prospects for a very profitable sale of the Center's real estate due to its prime location near Washington, D.C.

7

that an enforceable judgment, consent decree, or settlement is necessary for prevailing party status under § 1988). The plaintiffs appeal.

II.

After carefully considering the briefs, the joint appendix, and the arguments of counsel, we affirm on the reasoning of the district court. See Hunt v. Meszaros, Civ. No. CCB-91-2564 (D. Md. Mar. 25, 1999).

AFFIRMED

8